UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


DANIEL DYE,

                    Plaintiff


         v.                                C-1-06-05

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant


         This matter is before the Court upon the Report and Recommendation of the

United States Magistrate Judge (doc. no. 8), which follows, and plaintiff's objections

thereto (doc. nos. 9).  Plaintiff, a Disability Insurance claimant, brought this action

pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the

defendant denying plaintiff's application for disability insurance benefits.  The Judge

concluded that the ALJ's decision denying plaintiff disability insurance benefits is

supported by substantial evidence and therefore recommended that the decision of

the Commissioner be affirmed and this case be terminated on the docket of this

Court.

## REPORT AND RECOMMENDATION

Plaintiff filed his application for Disability Insurance Benefits in January, 2002. His application was denied, both initially and upon reconsideration. Plaintiff requested and obtained two hearings before an Administrative Law Judge (ALJ) in July and October, 2003. Plaintiff was represented by counsel at both hearings, at which Plaintiff and his wife testified as did Arthur Lorber, M.D., the Medical Expert (ME) and Janet Rogers, the Vocational Expert (VE). Following a partially unfavorable decision by the ALJ in April, 2004, Plaintiff processed an appeal to the Appeals Council. The ALJ found Plaintiff disabled for a closed period from July 7, 2000 until August 23, 2001, but not thereafter. The Appeals Council admitted two evidentiary items, but then refused to review the ALJ's decision in November, 2005. Plaintiff then filed his Complaint seeking judicial review in January, 2006. Plaintiff asserts that he is and was disabled after August 23, 2001 and that is the focus of this case.

## STATEMENT OF ERRORS

Plaintiff asserts that the ALJ erred in giving undue weight to the testimony of Dr. Lorber, who neither examined nor treated Plaintiff. Plaintiff also asserts that the ALJ failed to state "good reasons" why he rejected certain limitations imposed by Dr. Roberts, the treating physician. Plaintiff also asserts that his benefits should have continued after August 23, 2001 and that the ALJ erred when he considered Plaintiff's drug usage "material" in the absence of a finding of disability. Lastly,

Plaintiff asserts that the ALJ misconstrued his reports of pain and that the ALJ erred by accepting the VE's testimony that there were a representative number of jobs that Plaintiff could perform in the regional economy when the converse is true.

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff's lumbar degenerative disc disease status, post L3-4 fusion and narcotic dependency are severe impairments. The ALJ found that these impairments do not meet or equal the Listings. The ALJ further found that Plaintiff is unable to perform his past relevant work, but retained the residual functional capacity to perform the sedentary jobs of cashier, bench assembler and laborer.

## TESTIMONY OF PLAINTIFF AT THE HEARINGS

The hearing in July, 2003 was more organizational than evidentiary. The ALJ stated that his review of the medical record showed that Plaintiff had a fusion at L3-4 in May, 2001. Plaintiff's attorney volunteered that Plaintiff's post-surgical care has been by Drs. Hansen and Chow and that his client had a discogram in April, 2003. The focus of his post-surgical care was to wean him off Oxycontin. The ALJ expressed a desire to employ a medical expert. Plaintiff expressed an inability to complete vocational rehabilitation. (Tr. 347-351).

In October, 2003, the second hearing commenced.  The ALJ began with an initial statement that the medical record showed that Plaintiff underwent the fusion at L3-4 in May, 2001 and has had post-operative pain since that time.  The ALJ further stated that Plaintiff had undergone nerve blocks and thermal nerve destructions with minimal relief**.**  Then counsel inserted a comment more typical of closing argument than opening statement wherein he urged the ALJ to conclude that Plaintiff must be in severe pain to have undergone multiple invasive procedures. Plaintiff then contributed that he was also on several medications, Methadone, Xanax, Effexor and Neurontin.  Counsel then continued his opening statement by saying that Plaintiff had an annulus tear.

Plaintiff then testified that he was born in July, 1959 and was a high school graduate.  He smokes ½ pack of cigarettes per day.  He last worked as a brick layer in July, 2000.  Plaintiff testified that the job entailed pouring concrete, laying stone and brick, climbing ladders and scaffolding and lifting approximately 200 lbs.  Plaintiff testified that he had three incidents, two of which were observed by supervisory persons at the job site, where his leg "gave out."  The third incident resulted in his being sent home.  Plaintiff saw Dr. Roberts at the Mayfield Clinic and Dr. Roberts performed the fusion at L3-4 in May, 2001.  (Tr. 352-359, 369).

4

Plaintiff testified that 70-80% of the pain returned within three months, that Dr. Roberts wanted him to complete a physical therapy regimen, but that Plaintiff felt that he couldn't, so Plaintiff left the office with his medical records and sought the services and advice of his primary care physician, Dr. Horsley, who referred him to Dr. Hanson.

According to Plaintiff, Dr. Hanson felt that the fusion should have been at two levels because the lower disc was partially ruptured at the time of the surgery.  Dr. Hanson did nerve blocks and Botox injections for severe lumbar spasms as well as an ablation of the superglutial nerve branch.  Plaintiff stated he wears a back brace and uses a cane, although unprescribed, because the medication makes him "wobbly."  Plaintiff testified that his medications reduce but  do not eliminate his pain.  He spends much of his time in a recliner and has slept there for three years.

Plaintiff testified that Dr. Hanson referred him to Dr. Chow whom he sees on a monthly or bi-monthly basis.  He has difficulty climbing steps.  The location of the pain is within 4 inches above and below the belt line.  Plaintiff described the pain as "aching, burning, tingling and numbness" which radiates down his left leg.  Attempting to bend produces a stabbing pain.  He uses a reacher stick and wears shoes without laces.  He can stand about 15 minutes and sit about 10 minutes.  He can walk about half a city block.  His wife does all the driving.  (Tr. 360-367).

Plaintiff first experienced back problems in 1996, when he hurt his back at work. His primary care physician referred him to a specialist, Dr. Stambow, who diagnosed him with arthritis and prescribed pain pills, which he took for four years until he was referred to the Mayfield Clinic. Further surgery is anticipated, but is not likely to occur soon. (Tr. 368-370).

## MRS. DYE'S TESTIMONY

Bridgett Dye, Plaintiff's wife, testified that they have been married for 24 years and that she is employed by King's Local Schools as a bus driver. Mrs. Dye testified that her husband spends most of his time in his recliner, sleeps most of the day and talks to himself. She said that he is forgetful and that the only household chore he performs is folding laundry. (Tr. 371-373).

## THE MEDICAL EXPERT

Arthur Lorber, M.D. is a board certified orthopedic surgeon who has practiced since 1972. Dr. Lorber's opinions are based on his review of Plaintiff's medical records (Exhibits 1-8) as well as Plaintiff's responses to Dr. Lorber's questions relative to the quantity and power of the medications Plaintiff was currently taking. Plaintiff testified that he was taking 90 mg. of Methadone per day and 3 mg. of Xanax per day. He also takes 75 mg. of Neurontin and 150 mg. of Effexor per day.

Dr. Lorber was unable to find any diagnostic tests performed by Dr. Horsely and therefore concluded that his treatment of Plaintiff was "symptomatic." Dr. Lorber also expressed some familiarity with Dr. Hanson, whom he described as "claiming to be certified by 7-9 boards, all unrecognized by the American Medical Association." Dr. Hanson treated Plaintiff with a number of injection procedures, which Dr. Lorber found to be typical of Dr. Hanson. Dr. Lorber expressed disapproval about the length of time that Plaintiff was treated with addictive narcotic drugs.

Dr. Lorber testified that Plaintiff's back problems began in 1989 and that Dr. Horsely, his primary care physician performed trigger point injections, a procedure that Dr. Lorber described as "a bit unusual" for a primary care physician. A discogram, showing "a concordance of two disc levels, L3-L4 and L4-L5 was done by Dr. Tobbler . Plaintiff was seen by Dr. Roberts in April, 2001 and found to be "neurologically intact," but fusion at L3-L4 was performed in May, 2001. Upon discharge, Dr. Roberts expressed concern over Plaintiff's use of Oxycontin and referred him to Dr. Soya at Good Samaritan Hospital for detoxification. Dr. Roberts opined that the level of degeneration in Plaintiff's lumbar spine did not account for his level of pain. Rather, the pain was due to the psychological impact of the long-term use of Oxycontin.

Dr. Lorber testified that Plaintiff was treated by Dr. Hanson, who found him to be "neurologically intact" with negative straight-leg raising. Dr. Hanson's diagnosis was "spondylosis" and "sacroilitis." Dr. Hanson prescribed "Cadeum," a strong and addictive medication and performed a long series of injections "of virtually every part of the spine and supergluteal nerve." Dr. Lorber described Dr. Hanson's treatment as "highly unusual." A discogram was performed in February, 2002 and the response at L4-L5 was negative. (Tr. 374-377).

Dr. Wisenberger formulated a residual functional capacity and opined that Plaintiff could lift 35 lbs. occasionally, but 15 lbs. frequently, and could stand and walk for 6 hours and sit for six hours. Dr. Hanson referred Plaintiff to Dr. Chow, whose physical examination revealed "no evidence of focal neurologic deficit." A diagnosis of "internal disc disruption syndrome" was made "with right S-1 radiculopathy." A repeat discogram was done in April, 2003 and indicated "concordance at L4-L5." Dr. Chow subsequently performed a series of injections and a "neoplasty" at the L4-L5 level. The purpose of the neoplasty was to reduce the bulk of the disc. (Tr. 378-379).

Dr. Lorber diagnosed Plaintiff with an "iatrogenically induced drug problem with mental difficulties based on excessive dosage and prolonged use of narcotics." Dr. Lorber's opinion was that Plaintiff did not meet Listing 1.04 because he has no evidence of focal neurologic deficit. He does have mechanical low back pain emanating from several disc levels and is limited to sedentary work. Dr. Lorber's residual functional capacity included: a 10 lb. lifting limitation, a standing limitation of 2 hours and no more than 30 minutes at a time and a sitting limitation of six hours with a sit/stand option. In addition, Dr. Lorber would restrict Plaintiff from working at unprotected heights and from balancing, climbing and crawling, but Plaintiff could occasionally ascend ramps or stairs. Bending, stooping and kneeling should be limited.

Upon cross-examination, Dr. Lorber admitted that Plaintiff suffers from a torn annulus, that Plaintiff has an abnormal spine and that there is objective evidence to support Plaintiff's complaints of a certain amount of pain. Dr. Lorber also conceded that there is no mention in Dr. Chow's records of drug addiction. Dr. Lorber expressed the opinion that the treatment rendered by Drs. Hanson and Chow was "unnecessary." Despite a rather rigorous cross-examination by Plaintiff's counsel, Dr. Lorber's opinion was that Plaintiff's current level of functioning is not due to his organic pathology. (Tr. 379-403).

## THE VOCATIONAL EXPERT

The VE considered Plaintiff's past relevant work to be heavy and skilled, that he could not perform to that exertional level again and that he had no transferable skills relative to sedentary employment.  The ALJ accepted the residual functional capacity assessment of Dr. Lorber with the sole exceptions being that the ALJ limited Plaintiff's frequent lifting to 5 lbs. and restricted him from vibration.  With the restrictions outlined by the ALJ, the VE responded with a number of representative jobs in the regional and national economies.

## THE MEDICAL RECORD

Plaintiff's primary care physician is Charles Horsley, M.D., who has treated him for various problems since late 1985.  The first mention of a back problem was in March, 1993, when Plaintiff complained of "lower midline back discomfort," the stimulus for which was bending and lifting.  Straight-leg raising was negative.  Plaintiff was diagnosed with a "lumbar strain," given medication and an exercise program was recommended.  In August, 1996, Plaintiff again reported back pain.  Again he was prescribed medications, an exercise program was recommended and a diagnosis of "lumbar strain and spasm" was made.  When Plaintiff again reported back pain in September, 1996, straight-leg raising was negative, but the diagnosis was "lumbar strain."  This time three trigger-point injections were done and Vicodin and Naprosyn were prescribed.  In March, 1997, Plaintiff again reported back pain.  The diagnosis was "lumbar strain and spasm" and three additional injections were given and Vicodin was prescribed.  Plaintiff reported back pain in April and May, 1997.  (Tr. 119-124).

10

In July, 1997, Plaintiff again reported back pain.  Straight-leg raising was negative as was the lower extremity neurologic examination.  The diagnosis was "lumbar strain and spasm." Trigger point injections were repeated.  In August, 1997, Plaintiff was again diagnosed with "lumbar strain and spasm."  Plaintiff received two trigger point injections of Xylocaine and Celestone.  In March, 1998, Plaintiff was referred to a pain management specialist.  Dr. Horsely expressed concern over the long-term use of Vicodin.  In December, 1998, Plaintiff presented with low back pain. There was stiffness, but neurologic examination was normal and straight-leg raising was negative.  Two trigger point injections of Xylocaine and Celestone were done. Again, there was a discussion about Vicodin abuse, but a prescription for same was obtained.

In February, 1999, Vicodin was continued and two trigger point injections were again done.

In March, April, twice in June and in July, 1999, Plaintiff reported back pain. The treatment has become familiar - refill Vicodin and repeat a trigger point injections.  This treatment regimen continued on August 26, September 16, October 11, November 18 and December 2, but on December 2, 1999, Oxycontin was prescribed.

Plaintiff reported low back pain on January 27, February 24, March 17, April 25, May 9, June 6 and June 30, 2000, with the now familiar pattern of treatment. In July, 2000, Dr. Horsley requested an MRI when Plaintiff reported pain radiating down his right leg as well as numbness in the toes and weakness while walking. In July, 2000, a referral to the Mayfield Neurosurgical Group was made. Flexeril was prescribed. On August 21 and November 10, 2000, Oxycontin was again prescribed and trigger point injections were repeated. On, November 22, 2000, Plaintiff requested a higher dose of Oxycontin and obtained same. Then on December 5 and December 29, 2000, Plaintiff Oxycontin was refilled, trigger point injections of Xylocaine and Celestone were administered and the diagnosis was "herniated lumbar discs at L3-4 and a smaller disc at L4-5." On January 26, 2001, the trigger point injections were administered and Dr. Horsely noted that Dr. Shapiro had written a prescription for Oxycontin.

In May, 2001, Plaintiff reported that he had seen Dr. Roberts at Mayfield, that he preferred surgery to the recommended course of physical therapy. In June, 2001, Plaintiff reported that Dr. Roberts wanted him to taper off Oxycontin use. (Tr. 125-145).

A Cat scan was performed at Bethesda North Hospital in December, 2000. A "minimal disc bulge" was noted at the L3-4 level, but at the L4-5 level, there was a "posterior central annular tear with leakage of contrast through the annulus into the anterior epidural space. There were no radicular symptoms." (Tr. 146-147). A discogram also showed a "central posterior annular tear at L4-5 with leakage of contrast into the epidural space. His pain symptoms were discordant at this level." (Tr. 148-149).

Plaintiff saw John Roberts, M.D. in April, 2001. Dr. Roberts noted tenderness in the lumbar spine, 30 degrees of lumbar flexion, 5 degrees of extension, but Plaintiff was "neurologically intact." X-rays showed a "narrowing of the L3-4 disc space and a dark disc at L3-4" and CT/discography showed an "abnormal neucleogram at L3-4." The treatment plan was for a spinal fusion at L3-4. In July, 2001, Dr. Roberts reported that the instrumentation was in an excellent position and "no evidence of a pain producer at this level." It was the opinion of Dr. Roberts that "the majority of his pain is still related to the psychological impact of Oxycontin" and he did "not think there is enough evidence of degenerative change in the lumbar spine to account for this high level of pain." Subsequent contacts in May, 2001 with Plaintiff and his wife and with the pharmacist were for the purpose of weaning him from Oxycontin and for making a referral to Dr. Soya at Good Samaritan Hospital for treatment of Plaintiff's narcotic problem. Several contacts in June, 2001 indicated progress relative to Oxycontin weaning and then on June 22, 2001, Plaintiff requested a renewal of a prescription at a time when he would have had 24 pills remaining. (Tr. 151-157).

The spinal fusion at L3-4 was performed in May, 2001 by Drs. Roberts and Podore at Christ Hospital. (Tr. 160-169).

13

Plaintiff saw Kendall Hansen, M.D. in August, 2001.  The history taken by Dr. Hansen indicated that Plaintiff injured his low back while lifting during his employment as a stone mason in 1996.  He had a discectomy of the L3-4 disc and an annular tear at L4-5 with leakage into the epidural space.  Dr. Hansen's diagnosis was "lumbosacral spondylosis and sacroiliitis."  The treatment plan included "large joint injections to the bilateral sacroiliac joints and paravertebral nerve blocks."  The planned procedure was done in late August. 2001.  In October, 2001, Plaintiff underwent "thermal destruction of the median nerves of the posterior primary ramus" because more conservative treatment had failed and the pain generators had been located.  Then in October, 2001, Plaintiff complained of pain to the sacroiliac joint and again nerve blocks, described as "diagnostic" were administered to the left S2 and S3 median branches.  In November, 2001, a procedure known as "chemical neurolysis of the left sacroiliac joint" was completed.  (Tr. 170-184).

In December, 2001, Plaintiff reported a 20% reduction in low back pain.  The treatment plan was to perform "lumbar or caudal epidural saline steroid injections" and to obtain a discogram at the L3-4 level.  This was accomplished in early December, 2001.  Dr. Hansen agreed with a 30-lb. lifting restriction, apparently imposed by Dr. Roberts and opined that Plaintiff should never do repetitive bending.  A second steroid injection was performed in late January, 2002.  The discogram at L4-5 and L5-S1, performed in February, 2001, was negative, but resulted in a treatment plan of Botox injections.   After another diagnostic nerve block, Botox

injections were accomplished and the S2 and S3 nerve branches were denervated in April, 2002.

In May, 2002, a nerve block of the supragluteal nerve was accomplished. (Tr. 184-202).

In May, 2002, Robert Weisenburger, M.D. performed a physical residual functional capacity assessment. Dr. Weisenburger's opinion was that Plaintiff could lift 20-35 lbs. occasionally and 10-15 lbs. frequently. He could stand/walk for 6 hours and sit for 6 hours. Dr. Weisenburger's rationale for the above restrictions was that "Plaintiff complains of low back

pain, had a fusion at L4-5, and a discogram showed an annular tear at the L4-5 level. There is no evidence of muscle atrophy or sensory changes and gait appears to be normal, but lumbar areas are tender to palpitation." (Tr. 204-209).

Plaintiff saw David Chow, a physiatrist, in August. 2002. Dr. Chow's history indicated that Plaintiff had a lumbar fusion at L3-4 in 2001 and that his post-operative care included multiple joint facet blocks, radio-frequency ablations, SI joint blocks, cryo-ablation of the left superior gluteal nerve and Botox injections. An EMG of the right lower limb was negative. In November, 2002, Dr. Chow administered a "bilateral SI transforaminal nerve root block, a procedure that was repeated in December, 2002 and in January, 2003. Dr. Chow's diagnosis was "lumbar internal disc disruption syndrome" and "right SI radiculopathy." In April, 2004, Plaintiff presented for another lumbar discography at 4 levels. At L2-3, there was no evidence of annular tear or disc herniation. At L3-4, there was evidence of the prior

15

fusion, but "gross comprehensive lesions. At L4-5, there was an "abnormal irregular nucleogram with extravasion of contrast through a central annular tear and into a small to moderate central disc herniation." At L5-S1, there was a mild diffuse disc bulge, but no evidence of annular tear. The recommendation was for nucleoplasty at L4-5, and the procedure was performed at the University of Cincinnati Medical Center in September, 2003. (Tr. 210-228).

Dr. Roberts expressed the opinion that Plaintiff was disabled from any work from May 7, 2001 because his patient could not sit, stand, twist or turn. Dr. Roberts felt that "trial employment" should be able to begin in December, 2001, but that in the interim, Plaintiff was not a candidate for rehabilitation. (Tr. 238-241).

In November, 2003, Plaintiff was admitted to St. Luke Hospital for detoxification due to narcotic dependency. He was discharged two days later. (Tr. 260-317).

Charles Kuntz, M.D. at Mayfield Clinic saw Plaintiff in January, 2006 after a referral from Dr. Chow. There was "no evidence of a focal neurological deficit" nor "significant neural compression." There was evidence of degenerative disc disease at L4-5 "with mild central disc bulge/herniation." Dr. Kuntz did not recommend further surgery, but he did feel that chronic pain management was advisable." (Tr. 318-320).

An MRI in November, 2003 at four levels showed some abnormalities at two of those levels. At L1-2, there was a "mildly compressive annular bulge and at L4-5, there was a "central disc extrusion with mild caudal migration." (Tr. 321).

The medical record concludes with Plaintiff's treatment at Good Samaritan Hospital as a result of an attempted suicide. The stimulus was apparently an inability to obtain pain medication and mounting financial difficulties. Plaintiff had been selling Oxycontin and found himself without pain medication and in some degree of trouble financially. He was discharged three days later. He was diagnosed with major depression. (Tr. 340-343).

## OPINION

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

17

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(I), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner

18

must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321 (6th Cir. 1978); *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *see Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

19

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520©. Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S*., 736 F.2d 352, 357 (6th Cir.1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen,* No. 87-6189, slip op. At 4 (6th Cir. Oct.28, 1988). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S*., 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Secretary of H.H.S.,* 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of

pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above.

*Felisky*, 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano,* No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985).

If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.,* 508 F. Supp. 726, 730 (S.D. Ohio 1981).

In *Price v. Heckler*, 767 F.2d 281, 284 (6th Cir. 1985) and *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985), the Sixth Circuit Court of Appeals cited with approval *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), regarding the required specificity of an ALJ's findings of fact in a disability insurance case in order to facilitate meaningful judicial review. The Court in *Zblewski* stated:

> In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only when considered in isolation. It is more than merely "helpful" for the ALJ to articulate reasons (e.g., lack of credibility) for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review . . . [W]hen the ALJ fails to mention rejected evidence, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.

732 F.2d at 78-79. The specificity issue was also addressed in *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974), *cert. denied*, 420 U.S. 931 (1975):

> In our view an [ALJ's] findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision. This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the Commissioner's decision is supported by substantial evidence.

*Id.* at 312.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of*

24

*H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).  Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing.  *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176.  *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987).  The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming.  *Faucher*, 17 F.3d at 176.  *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

It is clear that the ALJ gave greater weight to the opinion of the Medical Expert, Dr. Lorber, who neither saw nor examined Plaintiff, than he gave to Dr. Roberts, the surgeon who performed the spinal fusion in May, 2001.  Dr. Roberts' opinion is supportive of a closed period of disability until December 1, 2001.  In a series of supplemental statements in May, June, July and August, 2001 by the attending physician, Dr. Roberts estimated that his patient could return to some type of work on a trial basis in December, 2001.  During the period from May to August, 2001, Dr. Roberts opined that Plaintiff suffered from a severe limitation of functional

25

capacity and was incapable of sedentary activity.  The clear implication is that the same level of incapacity occurred from August through November, 2001 because Dr. Roberts estimated that Plaintiff could return to some type of work on a trial basis as of December 1, 2001.  Like many surgeons, Dr. Roberts turned over Plaintiff's post-surgical evaluation and care to others, in this case Drs. Hansen and Chow.  Plaintiff saw Dr. Hansen in August, 2001, during the period of estimated disability as projected by Dr. Roberts.  The ALJ determined that despite the projections of Dr. Roberts that Plaintiff would be incapable of even sedentary activities until December 1, 2001, Plaintiff was no longer disabled after August 24, 2001 because on that day, Dr. Hansen found Plaintiff to have a "smooth, normal gait" and to be able to "sit normally during the interview."  He was "able to walk heel to toe without difficulty" and had "negative straight leg raising" and "no radicular symptoms to his leg."

The opinion of Dr. Roberts is at odds with that provided by Dr. Lorber only to the extent that the period between August and December, 2001 is impacted.  Dr. Roberts was not asked and did not provide any opinion relative to Plaintiff's ability to work after December 1, 2001.  So we cannot agree that there is any substantial conflict and that the ALJ disregarded or afforded improper weight to the treating physician's view.  To the contrary, the ALJ accepted the opinion of Dr. Roberts relative to Plaintiff's status when Plaintiff treated with Dr. Roberts.  What the ALJ did not accept is Dr. Roberts' projection in the face of the examination performed by Dr. Hansen within the period of Dr. Roberts' estimate.  In other words, that fact is more credible than opinion seems to be fairly well accepted among lawyers and judges.  We do not find Plaintiff's criticism of the ALJ's decision, based on an improper assessment of the weight to be afforded the treating physician to have any merit.

Next, Plaintiff asserts that the ALJ failed to state his reasons for not following the prognosis of Dr. Roberts other than to say that "This is an issue reserved for the Commissioner of Social Security to decide."  While we believe that the credibility of Dr. Roberts' opinion is for the ALJ to decide, the ALJ did say that Plaintiff did not treat with Dr. Roberts beyond August, 2001.  The ALJ also did say that his reason for finding Dr. Roberts' prognosis to be invalid was the facts uncovered during the physical examination and observations by Dr. Hansen in August, 2001.  These parts of the ALJ's written decision do adequately express his reasons for not following the estimate of Dr. Roberts.

The Plaintiff's third Statement of Errors relates to the fact that the ALJ terminated benefits after August 23, 2001. Plaintiff's argument is that the spinal fusion was not designed to restore neurological deficits, since Plaintiff had no neurological deficits prior to the surgery, but rather to alleviate pain. Plaintiff's argument is that Dr. Hansen's finding relative to neurological deficits does not show that Plaintiff's condition improved, since he had no neurological issues prior to surgery. Implicit in that argument is Plaintiff's apparent position that the ALJ should have evaluated the post-August, 2001 period in light of Plaintiff's level of pain.

It is true that Dr. Roberts would have preferred a more conservative course of treatment rather than surgery, but Plaintiff elected to have spinal fusion and there was an objective basis for surgery, to wit: degenerative disc disease at L3-4, as shown by x-rays and MRI scans, as well as Plaintiff's report of intractable pain. Plaintiff was taking prescribed Oxycontin prior to his contact with Dr. Roberts, the surgeon, and was not taking the drug in accordance with Dr. Horsely's instructions even then. We know that both Drs. Horsely and Roberts were concerned with Plaintiff's abuse of Oxycontin and we also know that Dr. Roberts believed that Plaintiff's post-surgical reports of pain were not supported. Drs. Roberts and Lorber concurred that "the majority of Plaintiff's pain was related to the psychological impact of his long-term use of Oxycontin." The fact that Plaintiff was admitted to Good Samaritan Hospital for detoxification is ample proof that Plaintiff had a drug problem. His failure to complete the program, whatever his purpose for being there, is significant especially since he knew that there was medical concern over his abuse of Oxycontin.

Plaintiff's abuse of Oxycontin simply does not help his claim for disability.  The medical evaluation is that either addiction is the source of the pain or that it is not reflective of one's pain level, since an addicted person my endure much pain in order to secure the drug.  If there was an objective basis for one's level of pain, the type and power of medication designed to alleviate the pain would provide an argument that a person would not ingest such medication unless he was in a great deal of pain.  But despite the fact that Plaintiff would be expected to suffer from some degree of pain because of a torn annulus and an abnormal spine, his current level of functioning could not be explained by his organic pathology.

Plaintiff's argument is that in order to consider whether drug usage is a contributing factor, material to the determination of disability, the ALJ should have first determined whether or not Plaintiff was disabled.  It is clear that the ALJ found that Plaintiff was not disabled by his finding that Plaintiff met neither Listing 1.04 nor 12.09 and his further finding that Plaintiff could perform a limited range of sedentary work.  The ALJ found that if Plaintiff were not addicted to narcotic medication, he could perform work in the above exertional range.

The ALJ's finding relative to a closed period of disability ending on August 23, 2001 is well supported and should be affirmed.

The next Statement of Errors concerns the ALJ's evaluation of Plaintiff's subjective reports of pain.  Specifically, Plaintiff says that the ALJ failed to consider psychological, rather than physical bases for pain.  We disagree.  The evidence supports the conclusion that Plaintiff had a physical basis for pain.  He has degenerative disc disease, has undergone fusion surgery and multiple attempts to obtain relief through nerve blocks, steroid injections and prescription drugs.  The consensus of medical opinion is that he can perform only sedentary work.  Plaintiff's problem is not that he has no physical basis for pain, but that he has no physical basis for the *degree* of pain that he subjectively reports.  The surgeon who performed the fusion surgery believes that Plaintiff's reports of pain are due to his long-term abuse of narcotic drugs and the Medical Expert agreed.  Thus, whether the cause of Plaintiff's pain is purely physical, psychological or most likely a combination of the two, the fact that narcotic dependency is a contributing factor to a finding of disability would and did preclude Plaintiff's receipt of benefits.  We find no error related to the ALJ's evaluation of pain.

Lastly, Plaintiff asserts that the ALJ improperly relied on erroneous information supplied by the Vocational Expert.  The VE testified that Plaintiff had no transferable skills, but that within the residual functional capacity assessment provided to her, that Plaintiff could perform the jobs of sedentary cashier, a portion of the bench assembly jobs and a portion of the jobs of factory-based labor.  The VE testified that the numbers of jobs available nationally for the cashier's job was 600,200 and 4,500

30

locally. For the bench assembly job, the VE testified there would be 40,200 jobs nationally and 300 locally. For the labor jobs, the numbers would be 17,800 nationally and 130 locally. Plaintiff accurately points out that the Dictionary of Occupational Titles lists the sedentary cashier as SVP 5, which is greater than unskilled. Defendant's contention that the ALJ didn't restrict Plaintiff to unskilled jobs doesn't help us. We still do not know how many unskilled sedentary cashier's jobs were available and although the ALJ did not restrict Plaintiff to unskilled work, the ALJ did accept the VE's opinion that Plaintiff had no transferable skills from his prior work as a brick and stone mason. Nonetheless, discounting the cashier's job category in its entirety, there are still 58,000 jobs available nationally.

"Work which exists in the national economy" is defined as "work which exists in significant numbers either in the region where [plaintiff] lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). "Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [plaintiff is] able to meet with [plaintiff's] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). In determining what constitutes a significant number of jobs, the Court should apply a common sense standard to the facts in each individual plaintiff's case. *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). Some of the criteria the Court may consider include: the level of plaintiff's disability; the reliability of the vocational expert's testimony; the reliability of the plaintiff's testimony; the distance plaintiff is capable of traveling to engage in

31

the assigned work; the isolated nature of the jobs; and the types and availability of such work. *Id.* at 275. While the distance plaintiff is capable of traveling to and from work is a factor to be considered, it refers to intrinsic factors pertaining to plaintiff's condition, not extrinsic factors such as where plaintiff had chosen to live in relation to any identified regional jobs. *Harmon v. Apfel,* 168 F.3d 289, 292 (6th Cir. 1999).

We find that 58,000 jobs constitutes a significant number of jobs in the national economy. *See Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). Moreover, we find it important to note that the Commissioner is not required to show that job opportunities exist within the local area. *See Harmon*, 168 F.3d at 292-93; *see also Dressel v. Califano,* 559 F.2d 504, 508-509 (8th Cir. 1977). Plaintiff offers no evidence showing that intrinsic factors concerning his condition preclude him from traveling to and from work. *Id.* at 292. There was no testimony that Plaintiff is completely unable to travel for any length of time in a car. Thus, the evidence establishes that the travel factor is not a physical issue but would be, at most, an extrinsic factor. *Id.* at 293. The vocational expert identified 58,000 jobs at the sedentary exertional level within the national economy which Plaintiff could perform. Such a number does not suggest that these are isolated jobs existing in very limited numbers in relatively few locations outside the region where Plaintiff lives. *See Hall,* 837 F.2d at 275. Accordingly, we find Plaintiff's argument in this regard to be without merit. As we have found that the ALJ's hypothetical accurately described Plaintiff, we find the vocational expert's response to said hypothetical constitutes substantial

evidence. *See Felisky*, 35 F.3d at 1036. Thus, substantial evidence supports the ALJ's finding that Plaintiff can perform a significant number of jobs within the national economy.

For the foregoing reasons, Plaintiff's assignments of error are without merit. The ALJ's decision is supported by substantial evidence and should be affirmed.

This concludes the pertinent part of the Report and Recommendation.

### *De Novo* Review

Judicial review of the defendant's decision is limited in scope by 42 U.S.C. § 405(g). The Court's sole function under the statute is to determine whether there is substantial evidence to support the defendant's findings of no disability. The defendant's findings should stand if, after a review of the record in its entirety, the Court finds that the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Kirk v. Sec. of HHS*, 667 F.2d 524, 535 (6th Cir. 1981).

Plaintiff objects to the recommendation of the Magistrate Judge because the defendant's decision denying benefits to the plaintiff was not supported by the substantial evidence.

The defendant has filed no response to plaintiff's objections, thus plaintiff's arguments are not controverted.

The plaintiff presents to the Court for *de novo* review four specific objections to the defendant's determination denying benefits to plaintiff after August 23, 2001.

1) The weight given by the ALJ to the non-examining medical advisor versus Dr. Roberts and the other treating doctors under 20 C.F.R. § 404.1527(d) and Social Security Ruling 96-2p (1996); 2) The failure to give "good reasons" under 20 C.F.R. § 404.1527(d) for rejecting the opinions of Dr. Roberts and Dr. Chow; 3) The use of narcotic pain medication and whether this is "material" to the finding of disability under 20 CFR 404.1535(b); and 4) the vocational errors.

Although the ALJ found plaintiff disabled for a closed period from July 7, 2000 until August 23, 2001, at the time of the hearing in October, 2003, the ALJ found that, after August 23, 2001, plaintiff's lumbar degenerative disc disease status, post L3-4 fusion and narcotic dependency were severe impairments that do not meet or equal the Listings and while plaintiff was unable to perform his past relevant work, he did retain the residual functional capacity to perform the sedentary jobs of cashier, bench assembler and laborer.   The ALJ based his finding on the testimony of certain of the medical witnesses and not others.

In assessing the medical evidence supplied in support of a claim, there are certain governing standards to which an ALJ must adhere.  Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc.*

34

*Sec.,* 378 F.3d 541, 544 (6th Cir. 2004).  Because treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone," their opinions are generally accorded more weight than those of non-treating physicians. 20 C.F.R. § 416.927(d)(2).  Therefore, if the opinion of the treating physician as to the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with other substantial evidence in [the] case record," then it will be accorded controlling weight. *Wilson,* 378 F.3d at 544.  When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.* However, in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding. Soc. Sec. Rul. 962p, 1996 WL 374188, at *4 ("In many cases, a treating physician's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight".).  *Rogers v. Comm'r of Soc. Sec.,* 468 F.3d 234, 242 (6th Cir. 2007).

There is an additional procedural requirement associated with the treating physician rule. Specifically, the ALJ must provide "good reasons" for discounting treating physicians' opinions, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* at *5. The purpose of this procedural aspect of the treating physician rule is two-fold. First, the explanation "'let[s] claimants understand the disposition of their cases,' particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Wilson,* 378 F.3d at 544 *(quoting Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* Because of the significance of the notice requirement in ensuring that each denied claimant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record. *Rogers*, 468 F.3d at 243. With these standards in mind, the court turns to the ALJ's consideration of the medical evidence in the present case.

36

In his first uncontroverted objection, plaintiff argues that as late as August 2, 2001, nearly three months after surgery, Dr. Roberts, a treating orthopedic surgeon, stated that plaintiff was disabled at least until December 1, 2001, or indefinitely.

The ALJ found that plaintiff was disabled and entitled to disability insurance benefits up to and including August 23, 2001 in spite of his use of prescribed oxycontin during this period. The ALJ stopped the disability benefits based on an examination done by Dr. Hansen on August 24, 2001. The ALJ failed to consider or comment on the subsequent medical evidence in the record provided by Dr. Hansen and Dr. Chow, accepting the testimony of Dr. Lorber, the non-examining medical advisor. *See Shelman v. Secretary*, 821 F.2d 316, 321 (6th Cir. 1987).

By December, 2001, Dr. Hansen reported only 20% relief of the low back pain for which Dr. Roberts had done low back surgery (Tr. 185). Dr. Hansen noted spasms of the back in March, 2002 (Tr. 194) and failure of conservative care by April, 2002 (Tr. 198). Dr. David Chow saw Mr. Dye for a first visit in August, 2002 and noted that the 2001 surgery had helped for only two to three months (Tr. 211) after the surgery performed in May, 2001 by Dr. Roberts. In 2002, Dr. Chow found right S1 radiculopathy on exams (Tr. 212-213). This continued into 2003 (Tr. 217-223). He concluded that Mr. Dye was a candidate for additional back surgery in April, 2003 (Tr. 224). Even Dr. Lorber acknowledged that plaintiff suffered an annulus tear in his spine.

The ALJ erred when the ALJ isolated one piece of medical evidence, the exam of Dr. Hansen on August 24, 2001, instead of looking at the record as a whole in assessing substantial evidence in this case. It is improper as a matter of law to focus on one piece of evidence under the substantial evidence standard, as the ALJ must instead look at the record as a whole under this standard. *See Mowery v. Heckler*, 771 F. 2d 966, 970 (6th Cir. 1985).

Plaintiff's second uncontroverted objection is the failure to give "good reasons" under 20 C.F.R. § 404.1527(d) for rejecting Dr. Roberts and Dr. Chow. Under § 404.1527(d), the ALJ must give "good reasons" for rejecting the medical information from a treating source. *Wilson*, 378 F. 3d at 544.

The only express reasons the ALJ gave for rejecting Dr. Roberts was that his conclusion of disability is an issue reserved to the Commissioner (Tr. 24) and that he no longer treated Mr. Dye after August, 2001. This is conclusory and is not a "good reason" for rejecting this doctor. The isolated exam by Dr. Hansen did not hold, and thus the ALJ could not rely on this one time exam as "good reasons" (under § 404.1527 (d)) for rejecting Dr. Roberts' limitations and specific conclusion that plaintiff should not return to work until December, 2001, if at all. Additionally, Dr. Lorber's information that plaintiff suffered an annulus tear that caused substantial pain at this very time and Dr. Chow's recommendation of back surgery in 2003 (Tr. 224) call into question any reliance on the August, 2001 exam of Dr. Hansen.

In his decision, the ALJ said he based his determination of plaintiff's residual functional capacity (RFC) on Dr. Lorber's testimony.  The ALJ, however, did not explain his failure to accept Dr. Lorber's testimony that narcotics use was not material to the disability determination, particularly when plaintiff's use of prescribed oxycontin during the closed period of disability found by the ALJ was not considered a contributing factor material to the determination of disability by the ALJ, or his failure to explain or discuss all the evidence provided by Dr. Hansen and Dr. Chow.

Dr. Lorber, an orthopedic specialist, criticized the treatment provided plaintiff by his treating physician, Dr. Hansen, a pain specialist.  The ALJ neither discussed the conflict nor explained his reasons for disregarding the treatment endured by plaintiff after August 24, 2001.  The ALJ stated that plaintiff's right leg pain and radiculopathy were found resolved by Dr. Hansen on August 24, 2001.  The ALJ did not discuss or explain the fact that, at the hearing, the plaintiff described his pain as "aching, burning, tingling and numbness" which radiates down his left leg.

In his third uncontroverted objection, plaintiff objects to the conclusion of the ALJ that the use of narcotic pain medication is material to the finding of disability under 20 C.F.R. § 404.1535(b).  The ALJ found this even though Dr. Lorber testified that the use of the prescribed medicine was not material to plaintiff's disability.  (Tr. 401).

39

At the time of the hearing, plaintiff's medications were Methadone, Xanax, Effexor and Neurontin. Dr. Lorber agreed plaintiff suffered from an annulus tear that caused pain. Plaintiff spends most of his time in his recliner, sleeps most of the day, talks to himself, is forgetful, does not drive a car at all, and the only household chore he performs is folding laundry.

It is clear that at the hearing in October, 2003, plaintiff was not prescribed Oxycontin or Vicodin and was not taking Oxycontin or Vicodin. Yet, the ALJ stated "claimant continued to be heavily treated with narcotic pain medication such as Vicodin, Oxycontin, and Methadone." At the time of the hearing, plaintiff's medications were Methadone, Xanax, Neurontin and Effexor.

In assessing materiality, 20 C.F.R. § 404.1535 (b) (1) and (2) require the ALJ to determine which impairments would remain, and how severe they would be, if the person stopped using narcotic drugs. The ALJ specifically found plaintiff disabled when he used drugs, but the ALJ did not explain (under § 404.1535(b)) which of his impairments would remain, how severe they would be if he stopped using the pain medication prescribed to him by his treating doctors, and the extent to which they would be disabling. The medical advisor Dr. Lorber did not deal with this, as he specifically testified that the narcotic use was not material (Tr. 401), even though the ALJ later found that it was material and in fact was disabling.

40

If the defendant cannot separate the use of drugs from the disability, then the defendant will find that such use is not material under 20 C.F.R. § 404.1535(b). *McGoffin v. Barnhart*, 288 F.3d 1248, 1253 (10th Cir. 2002).

All physicians, including Dr. Lorber, agree there is objective medical evidence that plaintiff suffers an underlying medical condition which produces pain; therefore, the ALJ must consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain and the recorded observations of pain by plaintiff's physician. Additionally, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to these factors.

In this case, the ALJ specifically found that Mr. Dye was not a malingerer and that he had been compliant with his treatment regimen, including the use of the narcotic drugs which had been prescribed to him by his treating doctors. If this is true, he would be disabled if these prescribed pain medications are medically necessary to control his pain. If he stops using these narcotic pain medications, then his pain is worse, not controlled, and could disable him under § 404.1535 (b).

In his fourth uncontroverted objection, plaintiff points out that the information presented by the VE is not reliable because clearly under the RFC established by the ALJ, plaintiff could not perform the job of cashier as the VE testified. This misinformation left only 930 jobs available to plaintiff in the region and 58,000 jobs available to plaintiff in the national economy.

It is the ALJ's responsibility, in making his/her determinations whether work exists in our economy in significant numbers that is available to plaintiff, to consider many criteria, some of which might include  the level of claimant's disability; the reliability of the VE's testimony; the reliability of the claimant's testimony; the distance the claimant is capable of traveling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on.  The decision should ultimately be left to the ALJ's common sense in weighing the statutory language as applied to a particular claimant's factual situation.  *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988).  Thus, the determination of the significant number of jobs under 20 C.F. R. § 404.1566 must be left to the defendant and not this reviewing Court.

Upon *de novo* review, this Court concludes the defendant's decision to deny benefits to plaintiff after August 24, 2001 is not supported by substantial evidence because all determinations were not adequately explained or based upon the record in its entirety.

The ALJ failed to identify the reasons for discounting the opinions of Drs. Roberts, Hansen and Chow and to explain precisely how those reasons affected the weight accorded the opinions; the ALJ failed to consider the totality of the medical evidence provided by Drs. Hansen and Chow or explain precisely why he did not consider their information and only focused on one piece of evidence, the August 23, 2001 examination by Dr. Hansen, when he established plaintiff's RFC; the ALJ failed

42

to determine what impairments would remain, including pain, and how severe the impairments would be, if the plaintiff stopped using his prescribed medications of Methadone, Xanax, Neurontin and Effexor; and the ALJ was provided misinformation by the VE upon which the ALJ relied in making his determination in this case.

The assessment of plaintiff's residual functional capacity must be driven by the consideration of all the accurate, relevant, medical and other evidence.  The ALJ's finding of plaintiff's RFC and use in establishing his ability to perform a significant number of jobs in our economy is flawed.

This Court concludes that the ALJ failed to provide sufficient justification for his denial of benefits after August 24, 2001.  The recommendation of the Magistrate Judge is rejected and denial of the award of benefits by the defendant to the plaintiff after August 24, 2001 is **REMANDED** to the defendant for further proceedings according to law.

Upon remand, the ALJ will 1) allow plaintiff the opportunity to testify at a supplemental hearing; 2) further evaluate the medical source opinions in the record and articulate the weight accorded to each and the rationale for the weight accorded; 3) further evaluate plaintiff's symptoms; 4) further evaluate the availability of a significant number of jobs in the economy after receiving accurate VE information; and 5) determine which of plaintiff's current physical and mental limitations, upon which the defendant based plaintiff's current disability determination, would remain if plaintiff stopped using plaintiff's prescribed medications of Methadone, Xanax,

43

Neurontin and Effexor and then determine whether any or all of plaintiff's remaining limitations would be disabling.

Accordingly, pursuant to the foregoing *de novo* review by this Court, the recommendation of the Magistrate Judge to affirm the decision of the defendant is **REJECTED**.  In light of plaintiff's uncontroverted objections, this Court concludes the decision of the defendant denying disability benefits to plaintiff after August 23, 2001, is not supported by substantial evidence in the record and is **REVERSED**.  This matter is  **REMANDED** to the Commissioner under 405(g) for further proceedings according to law.  This case is **TERMINATED** on the docket of this Court.

**IT IS SO ORDERED**.


                                        s/Herman J. Weber
                              Herman J. Weber, Senior Judge
                              United States District Court